THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

YVAN DUCHEINE,

      **Plaintiff,**

v.

**EAST ORANGE GENERAL HOSPITAL
and JOHN/JANE DOES A through D,**

      **Defendants.**

Case No. 19-cv-18827 (ES) (CLW)

OPINION

**CATHY L. WALDOR, U.S.M.J.**

      This matter comes before the Court upon Defendant East Orange General Hospital's ("EOGH") motion for summary judgment. (ECF No. 62). The parties consented to the undersigned's authority to resolve this motion. (ECF No. 50). In accordance with Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1, the Court resolves EOGH's application without oral argument. Upon careful consideration of the record for this matter, and for good cause shown, and for the reasons discussed herein, EOGH's motion is **GRANTED IN PART AND DENIED IN PART**.

      **I.**      **RELEVANT BACKGROUND**[1]

      **a.**  **Plaintiff's Employment with EOGH**

      Plaintiff Yvan Ducheine began working as a general surgeon at EOGH in 1998. (Def. Statement of Facts ¶ 1, ECF No. 62-3). In that role, Plaintiff was required to comply with and abide by EOGH's medical staff Bylaws. (*Id.* ¶ 7). Among other things, those Bylaws empowered

---

[1] Unless otherwise noted, the factual background discussed herein is adapted from portions of EOGH's Statement of Undisputed Material Facts that Plaintiff either expressly admitted or failed to adequately counter with relevant citations to the record.

EOGH's Medical Executive Committee to review the qualifications and credentials of applicants and staff members, including reappointments, terminations, and suspensions, (*id.* ¶ 8), and to subject medical staff members to "additional consultation, monitoring or proctoring requirements" in certain circumstances.  (*Id.* ¶ 9-10).

Plaintiff entered into multiple contracts with EOGH in connection with his employment: (1) a contract to come on staff and obey the law and the hospital's procedures; (2) a contract to take emergency room calls; (3) a contract to take on a physician advisory role; and (4) a contract to collect outstanding bills from the Essex County Correctional Facility for services rendered to Essex County inmates.  (*Id.* ¶ 62).  Those contracts required Plaintiff to remain in good status regarding his medical license and privileges.  (*Id.* ¶ 63).  At his deposition, Plaintiff did not recall if any of those contracts addressed the concept of proctoring or what would happen if he was suspended or placed on probation.  (*Id.* ¶ 64).

**b.  Discipline Imposed by the New Jersey State Board of Medical Examiners and the Subsequent Impact on Plaintiff's Employment With EOGH**

In 2003, two patients upon whom Plaintiff operated died either during or shortly after their procedures.  (*Id.* ¶ 2).  The New Jersey State Board of Medical Examiners ("NJSBE") thereafter investigated those incidents but did not take any disciplinary action against Plaintiff until September 2017, when it entered into a Final Consent Order with him.  (*Id.* ¶¶ 3-4).  Pursuant to that Final Consent Order, NJSBE suspended Plaintiff's New Jersey Medical License for twelve months.  (*Id.*  ¶ 4).  More specifically, the Final Consent Order, as modified by a Supplemental Order dated January 16, 2018, provided that Plaintiff would be actively suspended for two months and then placed on probation for the following ten months.  (*Id.*; Pl. Statement of Fact ¶ 5.2, ECF No. 63-3).  Under the terms of those orders, Plaintiff's active suspension would run from November 1, 2017 through January 16, 2018.  (*Id.*).  EOGH's Chief Executive Officer hired

Plaintiff to work as a Physician Advisor at EOGH during the time of his suspension so that he would still have a source of income. (Def. Statement of Facts ¶ 6, ECF No. 62-3). In that role, Plaintiff assisted the hospital with the implementation of electronic health records. (*Id.*).

On or about May 18, 2018, during the term of Plaintiff's probationary period, EOGH appointed Plaintiff to its medical staff with provisional privileges, subject to the condition that he submit to proctoring. (*Id.* ¶¶ 12-13). Specifically, EOGH required Plaintiff to complete eight major surgeries under the supervision of Dr. Lennox Alves and/or Dr. Jamie Soriano. (*Id.* ¶ 14). After doing so, Plaintiff "could be advanced to active staff status and become eligible to be placed on the Department of Surgery on-call schedule." (*Id.* ¶ 14). The parties agree that, in accordance with the Bylaws, EOGH had the authority to impose the proctoring condition on Plaintiff. (*Id.* ¶ 12-13).

Plaintiff notified EOGH that he had a "history" with Drs. Alves and Soriano, and while he tried to complete the required proctoring with them, he believed that they were deliberately delaying the process by failing to show up for their proctoring duties or complete necessary paperwork. (*Id.* ¶ 15). EOGH then approved another physician, Dr. Maheshwari, to proctor Plaintiff's remaining surgeries. (*Id.* ¶ 16). Plaintiff testified that there were delays in getting physicians to sign off on cases they had previously agreed to proctor. (*Id.* ¶ 17). Plaintiff further testified that he did not personally know the reason for the delays, (*id.* ¶ 17; Ducheine Dep. at 92:19-21, ECF No. 62-2), but that the hospital's call schedule played a part. (Def. Statement of Facts ¶ 18, ECF No. 62-3; Ducheine Dep. at 93:6-7, ECF No. 62-2). On or about September 14, 2018, Plaintiff sent a letter to Dr. Alves informing him about the difficulties he was having completing the proctoring requirement and returning to active staff status. (Def. Statement of Facts ¶ 18, ECF No. 62-3). In that letter, Plaintiff complained that Dr. Alves was "deliberately

delay[ing]" the process, opined that Drs. Alves and Soriano were personally profiting from that delay, and advising that Dr. Maheshwari had declined to provide further proctoring assistance. (Cert. of Ivan Novich, Esq. at Ex. M, ECF No. 62-2).

### c.   The State of New York's Investigation and Associated Discipline

By letter dated January 24, 2018, the New York State Department of Health advised Plaintiff that it was investigating his medical conduct.  (Def. Statement of Facts ¶ 20, ECF No. 62-3).  New York began that investigation after the State of New Jersey provided it with notice of the Final Consent Order and Supplemental Order that, as discussed above, resulted in the suspension of Plaintiff's New Jersey medical license.  (*Id.* ¶ 21).  At the State of New York's request, Plaintiff participated in an interview with State officials on April 6, 2018.  (*Id.* ¶¶ 23-24).  Plaintiff did not disclose New York's investigation to anyone at EOGH.  (*Id.* ¶ 25).

In August 2018, Plaintiff entered into a consent order with the New York State Board of Professional Medical Conduct, pursuant to which Plaintiff's New York medical license was suspended for twelve months, with a twelve month stay.  (*Id.* ¶¶ 29-30).  That consent order further provided that Plaintiff could only practice medicine in New York when supervised by a "practice monitor" approved in advance by the Board.  (*Id.* ¶ 32).  Plaintiff did not advise EOGH of the change regarding his New York medical license.  (*Id.* ¶ 37).  EOGH first learned of Plaintiff's consent order with the State of New York when the State sent a copy to the hospital.  (*Id.* ¶¶ 34-35).

### d.   Plaintiff's Suspension From EOGH

By letter dated October 1, 2018, EOGH's Chief Executive Officer, Paige Dworak, advised Plaintiff:  (1) that it had received the New York consent order; (2) that Plaintiff's failure to notify EOGH about the restrictions placed on his New York medical license was a violation of Plaintiff's

obligations under the hospital's Bylaws; and (3) as a result of that violation, EOGH was immediately suspending Plaintiff's provisional medical staff privileges. (*Id.* ¶¶ 34, 38). On October 26, 2018, Plaintiff's attorney sent a letter to Ms. Dworak "to request a hearing regarding the 'automatic suspension' of [Plaintiff's] provisional medical state privileges." (Novich Cert., Ex. P, ECF No. 62-2). Plaintiff's counsel further wrote: "[i]f there is interest in attempting to resolve this matter without a hearing, we would be interested in doing so, without waiving our rights to a hearing if a reasonable disposition, satisfactory to each party, cannot be reached." (*Id.*). Between October 26, 2019, and March 2019, the parties' attorneys had discussions regarding a potential resolution, but were ultimately unable to reach an agreement. (Def. Statement of Facts ¶¶ 41-42, ECF No. 62-3). Plaintiff did not reiterate his request for a hearing after those negotiations failed. (*Id.* ¶ 42).

### e.  Plaintiff's Charge of Discrimination Against EOGH

On June 3, 2019, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, alleging that EOGH discriminated against him based on his Haitian national origin. (*Id.* ¶ 43). In that Charge, Plaintiff represented that EOGH permitted other suspended physicians – later revealed to be Dr. Rae and Dr. Majid -- to have their active privileges reinstated without proctoring. (*Id.* ¶¶ 44-45). Plaintiff has conceded, however, that he was actually unaware if EOGH forced Drs. Rae or Majid to undergo proctoring. (*Id.* ¶ 47). Unlike Plaintiff, who is a general surgeon, Dr. Rae specializes in gynecology and Dr. Majid specializes in bariatrics. (*Id.* ¶ 46).

Elsewhere in his Charge of Discrimination, Plaintiff alleged that EOGH's decision to condition his return to active status on completing proctoring was discriminatory because, on at least two occasions, the hospital permitted physicians to join its staff without having to go through

proctoring.  (*Id.* ¶ 48).  At his deposition, however, Plaintiff clarified that this contention referred to the aforementioned situation with Drs. Rae and Majid.  (*Id.* ¶ 49).

Plaintiff also indicated in his Charge that EOGH returned non-Haitian physicians to work with surgical privileges once their suspensions had ended.  (*Id.* ¶ 50).  Plaintiff, however, has not been able to identify any such physicians.  (*Id.* ¶ 51).[2]

### f.  Facts Relevant to Plaintiff's Retaliation Claim

During his deposition, Plaintiff testified that he submitted a complaint to EOGH's human resources department indicating that he was being slandered and libeled.  (Def. Statement of Facts ¶ 53, ECF No. 62-3).  He could not recall, however, complaining to human resources about discrimination based on his national origin.  (*Id.* ¶ 54).  While Plaintiff testified he also spoke to Dr. Mehta regarding potential discrimination, Plaintiff described his comments to Dr. Mehta as follows:

> I am in my community and the fact I'm getting a fair amount of business from the community and these guys are delaying getting my privileges done.  That's, you know, unfair.  That's discriminatory.  And, mainly, because I speak the same language, I can get a better bit of business that these guys can.

(*Id.* ¶ 55).  Plaintiff does not recall speaking to Dr. Mehta about his being from Haiti or anything else related to his national origin.  (*Id.* ¶ 56).

Plaintiff has further conceded that he never told EOGH's CEO, Paige Dworak, that he was being discriminated against and is not aware that anyone else informed her that he had complained

---

[2] In its Statement of Fact number 51, EOGH stated:  "Dr. Ducheine was unable to identify any physicians/surgeons to support [the contention that EOGH permitted non-Haitian physicians to return to work post-suspension]."  (*Id.* ¶ 51).  In his responsive statement, Plaintiff wrote: "Plaintiff denies, [sic] that Plaintiff was unable to recall does not mean that he was unable to recall after some research and refresh of mind."  (Pl. Statement of Fact ¶ 51, ECF No. 63-3).  The portions of the record EOGH has cited, however, demonstrate that Plaintiff was unable to recall any such physicians during his deposition, and Plaintiff has not identified any in response to EOGH's motion for summary judgment.

about discrimination.  (*Id.* ¶¶ 57-58).  Plaintiff instead told Ms. Dworak that people at the hospital were "retaliating" against him, giving him a difficult time, and keeping him off the Emergency Room call schedule.  (Pl. Statement of Fact ¶ 57, ECF No. 63-3).  Plaintiff further conceded that he did not have any direct evidence that Ms. Dworak had a bias against people of Haitian national origin.  (Def. Statement of Facts ¶ 59, ECF No. 62-3).  Plaintiff testified, however, about his belief that the fact that Ms. Dworak signed the letter suspending him and permitted the suspension to take effect without giving Plaintiff a hearing is proof of her bias.  (Pl. Statement of Fact ¶ 59, ECF No. 63-3).  Plaintiff also testified generally that another physician of Haitian descent, Dr. Jeanlouie, was treated unfairly by EOGH during Ms. Dworak's tenure.  Finally, Plaintiff testified that he did not recall anyone from EOGH ever making any comments, derogatory or otherwise, about Haiti.  (Def. Statement of Facts ¶¶ 60-61, ECF No. 62-3).

### g.  Procedural History

Plaintiff asserted three distinct causes of action based on his employment with EOGH. First, Plaintiff alleges that, by giving non-Haitian physicians active staff privileges, without proctoring, at the conclusion of their suspensions, EOGH engaged in unlawful employment discrimination against him based on his Haitian origin, in violation of Title VII of the Civil Rights Act of 1964 and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et. seq.* ("NJLAD") (Compl. ¶¶ 22-23, ECF No. 1).  Second, Plaintiff alleges that EOGH unlawfully retaliated against him, in violation of the NJLAD, after he submitted a "a complaint to Human Resources about the differential treatment he was receiving, as well as the improprieties and toxic atmosphere at East Orange General."  (*Id.* ¶ 25).  Third, Plaintiff contends that EOGH breached the covenant of good faith and fair dealing by failing to provide a hearing regarding his suspension and termination.  (*Id.* ¶ 28). The parties have since completed discovery, and EOGH has moved for summary judgment

on all of Plaintiff's claims.  (*Generally* Def. Br., ECF No. 62-1).  That motion is fully briefed, (ECF Nos. 63, 64), and ripe for resolution.

II.    **LEGAL DISCUSSION**

a.  **Summary Judgment Standard**

A party is entitled to summary judgment pursuant to Federal Rule of Civil Procedure 56 when it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A factual dispute is material when it 'might affect the outcome of the suit under the governing law,' and genuine when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Ewing v. Cumberland Cnty.*, 152 F. Supp. 3d 269, 288 (D.N.J. 2015) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  A party moving for summary judgment must support its position by directing the Court to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial", *Ewing*, 152 F. Supp. 3d at 287 (citing *Anderson*, 477 U.S. at 250); *accord Indus. Corner Corp. v. Pub. Serv. Mut. Ins. Co.*, No. 20-cv-06677 (KM), 2023 WL 1860626, at *4 (D.N.J. Feb. 8, 2023) ("the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party."), and not just "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  A party's speculation, conclusory allegations, and unsupported assertions cannot create questions of material fact sufficient to withstand summary judgment.  *E.g.*, *Venneman v. BMW Fin. Servs. NA,*

*LLC*, 990 F. Supp. 2d 468, 471 (D.N.J. 2013) (citing *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999)).[3]

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson, 477 U.S. at 255)*. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *O'Toole v. Tofutti Brands, Inc.*, 203 F. Supp. 3d 458, 463 (D.N.J. 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)). "'If reasonable minds could differ as to the import of the evidence,' however, summary judgment is not appropriate." *Id.* (quoting *Anderson*, 477 U.S. at 250-51).

### b. Plaintiff's Discrimination Claims

While Plaintiff has asserted discrimination claims under both Title VII and the NJLAD, the Court notes that "[t]he analysis . . . applied in Title VII claims is equally applicable to actions brought under other civil rights statutes . . . and thus the Title VII analysis applies to claims brought under the NJLAD as well." *Cortes v. Univ. of Med. & Dentistry of New Jersey*, 391 F. Supp. 2d 298, 311 (D.N.J. 2005) (citing *Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1212 (3d Cir.1995)); *accord Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016). Where a plaintiff's Title VII and NJLAD discrimination claims rely on circumstantial evidence, *Tourtellotte*, 636 F.

---

[3] In the District of New Jersey, the parties must present the facts and evidence relevant to the summary judgment proceedings in statements prepared in accordance with Local Civil Rule 56.1 (requiring, among other things, that the parties address the relevant facts in separately numbered paragraphs, with appropriate citations to the record in support of each).

App'x at 841, "[c]ourts evaluate motions for summary judgment on [those] claims under a specialized burden-shifting regime . . . set out in the Supreme Court's decision in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Edmond v. Plainfield Bd. of Educ.*, 171 F. Supp. 3d 293, 305 (D.N.J. 2016). As one Court is this District described that process:

> The *McDonnell Douglas* framework has three basic steps. First, the plaintiff must put forward a *prima facie* case of . . . discrimination by a preponderance of the evidence. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). "Once a plaintiff makes a prima facie case of discrimination," the analysis moves to the second step: "the burden shifts to the [defendant] to provide a legitimate, nondiscriminatory reason for its actions." *Tucker v. Thomas Jefferson Univ.*, 484 F. App'x 710, 712 (3d Cir. 2012). "If the defendant does so," the analysis proceeds to the third step: "the inference of discrimination drops and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely pretext for intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). If each party meets its burden at each stage, summary judgment is inappropriate. *Whishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007).

*Graham v. Univ. Radiology Grp.*, No. 18-CV-8616 (BRM), 2020 WL 5640705, at *9 (D.N.J. Sept. 22, 2020) (citations in original). "Each step in the framework requires its own separate analysis." *Id.*

To establish a prima facie case of employment discrimination, "a plaintiff must first establish that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." *Tourtellotte*, 636 F. App'x at 842. While making a prima facie case represents a relatively "low bar", *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006), the Court finds that Plaintiff has failed to clear it.

EOGH has not presented any arguments regarding the first three elements and the Court finds that Plaintiff has satisfied them in any event.  First, given his Haitian national origin, Plaintiff is a member of a protected class.  Next, while Plaintiff encountered medical licensing issues related to two incidents in 2003, nothing in the record suggests that Plaintiff lacked the qualifications necessary to work as a general surgeon during the relevant period.  Turning to the third element, Plaintiff has identified two different adverse employment events.  In the first, Plaintiff alleges that EOGH unfairly delayed his return to active status at the hospital following the reinstatement of his New Jersey medical license.  In the second, Plaintiff contends that EOGH suspended his staff privileges after it learned that the State of New York had suspended his medical license.  Plaintiff has therefore established the first three elements of a prima facie case of discrimination.  He has not, however, demonstrated that either of the adverse employment actions he identified give rise to an inference of unlawful discrimination.  The Court will consider each in turn.

First, Plaintiff alleged that EOGH unfairly delayed his return to active staff status by requiring him to undergo a lengthy proctoring process after the NJSBE reinstated his medical license, and that non-Haitian surgeons who returned from suspension did not face similar proctoring requirements.  (Compl. ¶¶ 22-23, ECF No. 1; Def. Statement of Facts ¶¶ 44-45, ECF No. 62-3).  Plaintiff has not, however, directed the Court to any evidence in the record that supports his contention.  Instead, Plaintiff testified that he was unsure of whether either of the non-Haitian physicians he identified (Drs. Rae and Majid) underwent post-suspension proctoring.  (Def. Statement of Facts ¶¶ 44-45, 47, 49, ECF No. 62-3).  Nor was Plaintiff able to identify any other non-Haitian physicians who returned to active status, without proctoring, following a suspension. (*Id.* ¶¶ 50-51).

Turning to the second adverse employment action, EOGH's decision to suspend Plaintiff for his alleged violation of the hospital's Bylaws (i.e., for failing to advise the hospital of the suspension of his New York medical license), Plaintiff has similarly not directed the Court to any evidence that might support an inference of discrimination.  Addressing this issue in his brief, Plaintiff made a circular argument:  "[t]he suspension occurred under the circumstances that give rise to an inference of discrimination.  [sic] Because there was no other reason to suspend him other than his Haiti national origin."  (Pl. Br. at 6, ECF No. 63).  Plaintiff's suspicion, standing alone, is not sufficient to withstand a motion for summary judgment.  *Venneman*, 990 F. Supp. 2d at 471.  In his brief, Plaintiff also refers, without citation, to deposition testimony about how a situation in which "another [physician of] Haitian descent had been terminated outlined the discrimination framework for [Plaintiff]".  (Pl. Br. at 6, ECF No. 63).  It appears that Plaintiff may be referring to Dr. Jeanlouis, a Haitian physician whom, Plaintiff testified, had been stripped of certain responsibilities at EOGH.  (Ducheine Dep. at 239:7-240:12, ECF No. 63-2).  Plaintiff has not, however, provided any evidence – let alone admissible evidence – regarding the specifics Dr. Jeanlouis' situation or how it might support an inference of discrimination in Plaintiff's case.

For these reasons, the Court finds that Plaintiff has not presented an evidentiary basis from which a reasonable factfinder might infer unlawful discrimination in connection with the adverse employment actions EOGH took against him.  Plaintiff has, therefore, failed to establish a prima facie case of discrimination and EOGH is entitled to summary judgment on Count One of Plaintiff's Complaint.

c.      **Plaintiff's Retaliation Claim**

The Court next considers Plaintiff's claim that EOGH retaliated against him in violation of the NJLAD.  The relevant portion of that statute, generally speaking, makes it unlawful for employers to discriminate against current or potential employees on the basis of "race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, pregnancy or breastfeeding, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual," N.J.S.A. 10:5-12(a), as well as an individual's military status or willingness to submit to, or disclose the results of, genetic testing.  *Id.*  The NJLAD's anti-retaliation provision, in turn, makes it unlawful

> [f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under [the NJLAD] or because that person has sought legal advice regarding rights under [the NJLAD], shared relevant information with legal counsel, shared information with a governmental entity, or filed a complaint, testified or assisted in any proceeding under [the NJLAD] . . .

N.J.S.A. 10:5-12(d).

Like his discrimination claims, Plaintiff's retaliation claim is "controlled by the three-step burden-shifting framework set forth in [*McDonnell Douglas*]."  *Tourtellotte*, 636 F. App'x at 841. The Court therefore begins its analysis by determining whether Plaintiff has established a prima facie case of retaliation.  Plaintiff must do so "by showing '(1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action.'"  *Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 939 (3d Cir. 2009) (*quoting Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir.2001)).

Upon careful consideration of the motion record, the Court finds that Plaintiff has failed to make the necessary prima facie showing, as he has not established that he engaged in a "protected activity" within the meaning of the NJLAD.  As the United States Court of Appeals for the Third Circuit has observed, "not every complaint or letter entitles its author to protection from retaliation under the NJLAD.  Rather, only challenges to discrimination prohibited by the NJLAD—such as discrimination on the basis of race, age, or gender, constitute 'protected activity.'"  *Ogunbayo v. Hertz Corp.*, 542 F. App'x 105, 106–07 (3d Cir. 2013) (citations omitted).  While the record reflects that Plaintiff has certainly complained about his treatment at EOGH, he has not directed the Court to facts suggesting that those complaints fall within the ambit of the NJLAD's anti-retaliation provision.

In his pleading, Plaintiff alleged that EOGH retaliated against him for filing a complaint with the hospital's human resources department "about the differential treatment he was receiving, as well as the improprieties and toxic atmosphere at East Orange General."  (Compl. ¶ 25, ECF No. 1).  During his deposition, however, Plaintiff testified that his complaint to human resources concerned him being slandered and libeled by others at the hospital, and that he did not recall ever complaining to that department about discrimination based on his national origin.  (Def. Statement of Facts ¶¶ 53-54, ECF No. 62-3).  That evidence does not reflect that Plaintiff engaged in a protected activity under the NJLAD.

In his brief, Plaintiff argues that he directly complained to Dr. Mehta about his national origin playing a role in the hospital's delay in returning him to active status post-suspension, citing a passage from his deposition transcript.  (Pl. Br. at 11-12, ECF No. 63) (citing Ducheine Dep. at

196, ECF No. 63-2).[4]  Indeed, when EOGH's counsel repeatedly sought a "yes or no" answer to the question of whether Plaintiff explicitly told Dr. Mehta that the hospital had discriminated against Plaintiff on account of his being from Haiti, Plaintiff responded: "The answer is yes.  The exact words I used, I don't remember at this time." (Ducheine Dep. at 197:15-20).  When EOGH's counsel asked Plaintiff to elaborate on that interaction, (*id.* at 198:17-199:2), however, Plaintiff described his comments to Dr. Mehta as follows:

> I am in my community and the fact I'm getting a fair amount of business from the community and these guys are delaying getting my privileges done.  That's, you know, unfair.  That's discriminatory.  And, mainly, because I speak the same language, I can get a better bit of business that these guys can.

(Def. Statement of Facts ¶ 55, ECF No. 62-3; Ducheine Dep. at 198:17-199:10, ECF No. 63-2). When asked directly thereafter whether he mentioned his national origin or being from Haiti during that interaction, Plaintiff testified that he did not recall doing so.  (Def. Statement of Facts ¶ 56, ECF No. 62-3; Ducheine Dep. at 199:11-14, ECF No. 63-2).  In essence, Plaintiff complained to Dr. Mehta that EOGH's delay in returning him to active status was unfair, as it prohibited Plaintiff from using an inherent advantage (shared language with the Haitian members of the community) to earn business.  That is *not* a complaint of discrimination based on national origin and does not appear to be any other type an NJLAD-protected activity.

Plaintiff also argues that his September 14, 2018 letter to Dr. Alves constitutes a "protected activity."  (Pl. Br. at 12, ECF No. 63).  Plaintiff did not propose any statements of undisputed material fact regarding that letter or provide any citations in his briefing.  The Court has

---

[4] Plaintiff's argument on this point directly contradicts the responsive Statement of Facts he submitted in connection with his opposition.  Specifically, EOGH's Statement of Fact number 56 stated:  "Dr. Ducheine does not recall every [sic] saying anything to Dr. Mehta about his being from Haiti or about his national origin."  (Def. Statement of Facts ¶ 56, ECF No. 62-3).  Plaintiff admitted that statement without further comment.  (Pl. Statement of Fact ¶ 56, ECF No. 63-3).  In the interests of justice, the Court will nevertheless consider the merits of Plaintiff's argument.

nevertheless reviewed the letter, which EOGH submitted as an exhibit to its attorneys' certification. In that letter, Plaintiff wrote, in pertinent part: "it is evidently clear that after 40+ surgical cases at EOGH from May 2018 to now, my progression from Provisional Staff to Active Staff Status is being deliberately delayed by you. A delay that you and Dr. Soriano are financially benefitting from to the rate of $6,000+/month." (Novich Cert., Ex. M, ECF No. 62-2). Nowhere in that letter did Plaintiff suggest that anyone at EOGH was discriminating against him, let alone doing so based on his Haitian national origin. (*Generally id.*). Rather, Plaintiff was accusing Dr. Alves of delaying his reinstatement for personal financial gain. (*Id.*). While Plaintiff argues that this reflects "whistleblowing on Dr. Alves and Dr. Soriano's unethical or possible unlawful practice", (Pl. Br. at 13, ECF No. 63), he does not explain how that might constitute a NJLAD-protected activity.

Finally, while Plaintiff does not address the issue in his brief, it bears noting that Plaintiff conceded at deposition that he never told EOGH's Chief Executive Officer, Paige Dworak, that he was being discriminated against and is not aware that anyone else informed her that he had complained about discrimination. (Def. Statement of Facts ¶ 57-58, ECF No. 62-3). Plaintiff instead told Ms. Dworak that people at the hospital were "retaliating" against him, giving him a difficult time, and keeping him off the Emergency Room call schedule. (Pl. Statement of Fact ¶ 57, ECF No. 63-3).

In conclusion, the Court finds that Plaintiff has not demonstrated that he engaged in a protected activity within the meaning of the NJLAD. The portions of the record Plaintiff cited in his opposition do not create a genuine issue of material fact on this issue. As Plaintiff has failed to establish a necessary element of his retaliation claim, the Court will enter summary judgment in EOGH's favor on that cause of action.

d.    **Plaintiff's Claim for Breach of the Implied**
                 **<u>Covenant of Good Faith and Fair Dealing</u>**

In the final count of his Complaint, Plaintiff alleges that EOGH violated the covenant of good faith and fair dealing implied in the parties' agreements by failing to provide him with a hearing in connection with his suspension or termination.  (Compl. ¶ 28, ECF No. 1).  "Under New Jersey law, in every contract there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing.'"  *Harmon v. Borough of Belmar*, No. 17-cv-2437 (PGS), 2020 WL 833061, at *5 (D.N.J. Feb. 20, 2020) (quoting *Wade v. Kessler Inst.*, 343 N.J. Super. 338, 345 (App. Div. 2001); *accord Fields v. Thompson Printing Co.*, 363 F.3d 259, 270 (3d Cir. 2004) (citations omitted).  "To recover for breach of the implied covenant, a plaintiff must prove that: (1) a contract exists between the parties; (2) the plaintiff performed under the terms of the contract; (3) the defendant acted in bad faith with the purpose of depriving the plaintiff of rights or benefits under the contract; and (4) the defendant's actions caused the plaintiff to sustain damages."  *Luongo v. Vill. Supermarket, Inc.*, 261 F. Supp. 3d 520, 531-32 (D.N.J. 2017) (citation omitted).

While the parties have entered into multiple contracts, (Def. Statement of Facts ¶ 62, ECF No. 62-3; Pl. Statement of Fact ¶¶ 62, 65, ECF No. 63-3), they agree that, to the extent Plaintiff has a right to a pre-suspension hearing, it derives from EOGH's Bylaws, which apply to every member of the hospital's medical staff.  (Def. Br. at 22-23, ECF No. 62-1; Pl. Br. at 14-17, ECF No. 63; Def. Statement of Facts ¶ 7, ECF No. 62-3).  EOGH does not argue that the terms of the Bylaws are insufficient to support an implied covenant of good faith and fair dealing (i.e., the first element of the cause of action).  Nor does EOGH offer any arguments regarding the third (defendant acting in bad faith) or fourth (Plaintiff suffering damages) elements of Plaintiff's claim

for breach of that covenant.  Rather, EOGH's argument is focused on the second element:  whether Plaintiff satisfied the conditions necessary to require EOGH to provide a hearing under the Bylaws.  (Def. Br. at 22-23, ECF No. 62-1).

The relevant provisions of the Bylaws are not in dispute.  The parties agree that Section 7.2 "provides the suspension of staff membership, suspension of clinical privileges exceeding 14 days, denial of medical staff reappointment, and involuntary impositions of significant consultation or monitoring requirements, are all grounds for a hearing."  (Def. Statement of Facts ¶ 39, ECF No. 62-3; Cert. of John Herbert, Ex. 1 at 73, ECF No. 63-2 ).  Section 7.3-1 requires EOGH to provide affected individuals with written notice of any decision that might constitute grounds for a hearing under Section 7.2, and to include specific information therein, including the individual's right to request a hearing.  (Cert. of John Herbert, Ex. 1 at 73, ECF No. 63-2).  Section 7.3-2, titled "Request for Hearing", provides:

> The member shall have thirty (30) days following receipt of notice of such action to request a hearing.  The request shall be in writing addressed to the Medical Executive Committee with a copy to the Board of Directors.  In the event the member does not request a hearing within the time and manner described, the member shall be deemed to have waived any right to a hearing and to have accepted the recommendation or action involved.

(*Id.* at 74).

Here, EOGH advised Plaintiff of its decision to suspend him by letter dated October 1, 2018.  (Novich Cert. Ex. J, ECF No. 62-2).  That letter invoked multiple provisions of the Bylaws and, among other things, notified Plaintiff of his right to request a hearing under Section 7.3, as well as directions on how to do so.  (*Id.* at 2).  EOGH contends that Plaintiff failed to effectively request a hearing in response to its notice of suspension.  (Def. Br. at 22-23, ECF No. 62-1).  Specifically, EOGH argues (1) that Plaintiff failed to request a hearing at all; and (2) assuming

Plaintiff *did* make such a request, he nevertheless failed to send a copy to the hospital's board of directors as required under Section 7.3-2 of the Bylaws.

As to the first point, the record reflects that Plaintiff's counsel sent a letter with the subject line "Hearing Request – Yvan Ducheine, M.D." to EOGH's Chief Executive Officer on or about October 26, 2018.  (Novich Cert. Ex. P, ECF No. 62-2).  In that letter, counsel wrote:

> [Plaintiff] has engaged our law firm to request a hearing regarding the "automatic suspension" of his provisional medical staff privileges at East Orange General Hospital.  If there is interest in attempting to resolve this matter without a hearing, we would be interested in doing so, without waiving our rights to a hearing if a reasonable disposition, satisfactory to each party, cannot be reached.  Please do not hesitate to call or to have your legal counsel call to discuss if there is interest.

(*Id.*).  EOGH contends that, because Plaintiff's counsel's letter raised the idea of a pre-hearing resolution, it was insufficient to serve as a hearing request pursuant to Section 7.3-2 of the bylaws. This Court disagrees.  While counsel's letter expressed a hope for an amicable resolution, it also unequivocally sought a hearing regarding Plaintiff's suspension. At the very least, there is a question of fact as to whether Plaintiff's letter sought negotiations in lieu of a hearing.

Turning to EOGH's second argument- that Plaintiff's counsel's October 26, 2018 letter failed to function as hearing request under the Bylaws because counsel failed to send a copy to the hospital's board of directors – the Court finds that at least one issue makes summary judgment inappropriate.  The relevant portion of the evidentiary record is clear.  Counsel addressed his letter to EOGH's CEO, Paige Dworak and sent copies to Plaintiff, the East Orange Medical Executive Committee, Ms. Padmaji Kodali, and Dr. Anuj Mehta.  (*Id.*).  Thus, Plaintiff did not send a copy to the hospital's Board of Directors, as required under the Bylaws.  The Court cannot ignore, however, the explicit directions that EOGH provided in its October 1, 2018 letter:

> If you wish to request a hearing, you must do so in writing to Paige Dworak, Chief Executive Officer, East Orange General Hospital,

19

> 300 Central Avenue, East Orange, NJ 07018.  You must request a
> hearing by 5:00 p.m., October 30, 2018, thirty (30) days from the
> date of this letter, or your right to a hearing will be waived . . .

(Novich Cert. Ex. J, ECF No. 62-2).  Plaintiff's counsel followed Ms. Dworak's directions, which

contradicted those set forth in the Bylaws.  (*Compare id. with* Cert. of John Herbert, Ex. 1 at 74,

ECF No. 63-2) ("The request shall be in writing addressed to the Medical Executive Committee

with a copy to the Board of Directors.").  The parties have not explored the legal ramifications of

EOGH's advice, which came in a letter intended to inform Plaintiff of his right to request a hearing.

This is particularly significant given the nature of Plaintiff's claim – that EOGH acted in a manner

that interfered with his ability to enjoy the fruits of the parties' agreement.  The Court cannot grant

summary judgment on this record.

### III.   <u>CONCLUSION</u>

Based on the foregoing, the Court will grant EOGH's motion for summary judgment in

part and deny it in part.  Specifically, the Court **GRANTS** EOGH's motion with regard to Counts

One and Two of Plaintiff's Complaint and will enter judgment in EOGH's favor as to those claims.

The Court **DENIES** EOGH's motion with regard to Count Three of Plaintiff's Complaint.  A

separate form of Order will follow this Opinion.

**SO ORDERED**

<u>s/ Cathy L. Waldor</u>
**CATHY L. WALDOR, U.S.M.J.**

**Date:**  March 15, 2023

cc:  Hon. Esther Salas, U.S.D.J.